**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CRIMINAL ACTION NO. 12-02-DLB**

**UNITED STATES OF AMERICA**                                                          **PLAINTIFF**

**vs.**                              **MEMORANDUM OPINION & ORDER**

**JAMES EDWARD LYKINS**                                                          **DEFENDANT**

                                        \*\*\*   \*\*\*   \*\*\*   \*\*\*

        This matter is before the Court on Defendant's Motion to Suppress (Doc. # 17) all

evidence seized from his residence and curtilage on October 12, 2011.  After the motion

was fully briefed (Docs. # 21, 22), the Court held an evidentiary hearing on April 3, 2012

to develop the factual basis for Defendant's motion.  (Doc. # 29).  Defendant Lykins was

present at the hearing and represented by Attorney Steven Howe.  The United States was

represented by Assistant United States Attorney Robert McBride.  The hearing was

recorded by Official Court Reporter Lisa Wiesman.  At the conclusion of the hearing, the

Court allowed the parties additional time to submit supplemental briefing.  All supplemental

briefing having now been filed (Docs. # 32, 34), this matter is ripe for the Court's

consideration.  For the reasons set forth herein, Defendant's Motion to Suppress is hereby

**denied.**

        I.        **Issues Raised**

        In his Motion, Defendant seeks to suppress all evidence seized from his residence

and curtilage on October 12, 2011.  In support, Defendant argues that the search of his

residence and seizure of evidence was unreasonable in violation of his rights secured by the Fourth Amendment of the U.S. Constitution.  Specifically, Defendant argues the search was conducted without a warrant, and the officers did not otherwise have reasonable suspicion to conduct a warrantless search of his residence pursuant to *Griffin v. Wisconsin*, 483 U.S. 868 (1987).

**II.    Findings of Fact**

Three witnesses testified during the April 3, 2012 evidentiary hearing.  The United States called United States Probation Officer John D'Alessandro and Pendleton County Sheriff Craig Peoples.  Defendant recalled D'Alessandro and also testified on his own behalf.  Weighing the credibility of the witnesses, and considering the exhibits admitted during the hearing, the Court makes the following factual findings:

1.    On October 25, 2004, Defendant Lykins was convicted of conspiring to manufacture and distribute methamphetamine in violation of 21 U.S.C. § 846.  Defendant was sentenced by the undersigned to a sixty (60) month term of imprisonment, followed by a five (5) year term of supervised release.

2.    The October 25, 2004 Judgment included thirteen (13) Standard Conditions and three (3) Special Conditions of Supervised Release.  (Ex. # 1).  Among the Standard Conditions, Defendant was ordered to "permit a probation officer to visit him ... at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer."  (*Id.* at 3). Additionally, under the Special Conditions of Supervised Release, Defendant was ordered to "submit his person, residence and curtilage, office or vehicle to a search, upon direction and discretion of the United States Probation Office."  (*Id.* at 4).

2

3.     As part of the United States Probation Office's standard procedure for preparing an inmate to transition to supervised release, United States Probation Officer John D'Alessandro met with Defendant on August 5, 2009 to discuss the details of his supervised release.  During that discussion, D'Alessandro provided Defendant with a copy of the Judgment and read each of the conditions of supervised release contained in the Judgment to Defendant.  D'Alessandro and Defendant then signed and dated the Judgment under an Acknowledgment stating, "[t]hese conditions have been read to me. I fully understand the conditions and have been provided a copy of them."  (Ex. # 1, at 4).

4.     On September 12, 2011, while Defendant was still under supervised release, the United States Probation Office received an anonymous letter stating that "[s]omeone really needs to check on Jimmy Lykins.  He is out of control and needs drug tested (sic)." (Ex. # 4).  Based on the anonymous letter, D'Alessandro determined that he should visit Defendant at his home and give Defendant a drug test.

5.     At approximately 1:30 p.m. on October 12, 2011, D'Alessandro was traveling between Maysville, Kentucky and Defendant's residence when he stopped at the Pendleton County Sheriff's Office to speak to Sheriff Craig Peoples about an unrelated matter.  At the conclusion of their conversation, D'Alessandro mentioned that he was on his way to Defendant's residence to conduct a home visit.   In response, Peoples informed D'Alessandro that he had just received an e-mail notification from the National Precursor Log Exchange ("NPLEx") stating that Defendant's wife, Christa Lykins (also known as "Christa D. Vance"), had purchased pseudoephedrine, a precursor to methamphetamine, at 12:56 p.m. in Boone County, Kentucky.  (Ex. # 2).  The e-mail notification listed Defendant's address as one of Christa Lykins' last known addresses. (*Id.*).

3

6.      Peoples explained to D'Alessandro that the NPLEx notification on Christa Lykins gave him concern about Defendant's potential criminal activity.  He explained that he had been investigating various individuals, including Christa Lykins and Defendant, for a couple of years for their involvement in the manufacturing of methamphetamine.  As part of his investigation, he received notifications from NPLEx whenever any of these individuals purchased pseudoephedrine.  When Peoples received a notification from NPLEx about any of these individuals, "it lead[ ] him to believe that if they're not preparing to manufacture methamphetamine that day, then they will maybe in the . . . next day or so."  (Doc. # 31, at 55).  Peoples shared these suspicions with D'Alessandro.

7.      Based on the Defendant's prior methamphetamine related conviction, the anonymous letter, and the NPLEx notification, D'Alessandro's suspected that Defendant was not only using methamphetamine, but that "there may be some type of methamphetamine tracking (sic) or the purchasing of precursors at [Defendant's] residence." (Doc. # 31, at 15).  After gathering this information, D'Alessandro requested that Peoples accompany him to Defendant's residence to conduct a standard home inspection.[1]

8.      Between twenty (20) and thirty (30) minutes later, D'Alessandro and Peoples arrived at Defendant's residence in separate vehicles.  D'Alessandro walked to the front door and knocked as Peoples proceeded around the side of the house.  Without delay, Defendant answered the door.  D'Alessandro notified Defendant that he had concerns that

---

[1] At the evidentiary hearing, D'Alessandro explained the scope of a home inspection.  "Typically when I do a home inspection, it's to verify the offender does reside there, that he does have his belongings there, that the residence is appropriate for the offender's standard of living."  (Doc. # 31, at 28).  D'Alessandro also explained that he "would walk through the entire house, walk through each room, any out buildings, have him show me everything that's around the residence."  (*Id.* at 28-29).

Defendant was violating the terms of his supervised release based on a letter sent to the Probation Office.

9.      Defendant opened the door and allowed D'Alessandro and Peoples into the residence. D'Alessandro walked in first and held the door open for Peoples to follow. As D'Alessandro entered, he could smell hamburgers cooking on the stove. Peoples followed D'Alessandro through the door and smelled a chemical odor, which he later described as "a very distinct odor, [that] outweighed the smell of the cooking grease."

10.     Upon smelling the chemical odor, Peoples tapped D'Alessandro on the shoulder and asked if he smelled something. Peoples described the smell to D'Alessandro, at which time D'Alessandro distinguished the chemical odor from the hamburgers.[2]

_____

[2] In Defendant's supplemental brief, he argues that D'Alessandro never detected the chemical smell or, alternatively, that he did not know the smell was associated with manufacturing methamphetamine. As support, Defendant argues that D'Alessandro's testimony at the evidentiary hearing that he smelled the chemical odor is contradicted by D'Alessandro's prior testimony as well as Peoples' testimony at the evidentiary hearing.

During Defendant's detention hearing, D'Alessandro stated, "I believe the sheriff noted the smell. He indicated it to be like a metallic smell. I didn't notice it, but he indicated he did." Defendant suggests that this testimony conflicts with D'Alessandro's testimony at the evidentiary hearing that he did, in fact, smell something metallic. However, D'Alessandro explained in the evidentiary hearing that his detention hearing testimony was about what he smelled *as he entered* Defendant's residence. His additional testimony at the evidentiary hearing explained that *after* Peoples pointed out the metallic smell, he was able to distinguish it from the hamburgers. Ultimately, this testimony is in no way conflicting, but rather addressed what D'Alessandro smelled at two different points in time.

Second, Defendant contends that D'Allesandro's testimony at the evidentiary hearing conflicted with Peoples' testimony. D'Allesandro testified that he was only able to detect the chemical odor after Peoples pointed it out to him. Additionally, D'Allesandro suggested that Peoples explained that the chemical odor was associated with ingredients used to manufacture methamphetamine. However, Defendant argues that Peoples testified he never specifically pointed out the metallic smell, nor did he suggest that he smelled a precursor to methamphetamine.

Defendant attempts to limit the scope of the conversation between Peoples and D'Alessandro about the chemical smell. Peoples testified that as he entered Defendant's residence, "I mentioned to [D'Alessandro], I asked him as we walked – when I smelled the odor, asked him if he smelled that." Defense counsel then asked, "What did you say? 'Do you smell that?'" Peoples responded, "I don't remember the exact words." Peoples also testified that he could not remember how D'Alessandro responded to his question, and that he said nothing else after D'Alessandro's response.

Peoples' testimony does not conflict with D'Alessandro's testimony. While Peoples was unable to remember exactly what he asked, D'Alessandro recalled that Peoples asked him whether he smelled something metallic that was distinguishable from the cooking hamburgers. D'Alessandro also recalls that Peoples' question suggested that the metallic smell was commonly associated with a precursor to

D'Alessandro later referred to the chemical odor as a "metallic smell."  Peoples also indicated to D'Alessandro that the chemical odor smelled  like Coleman fuel, a potential ingredient used to manufacture methamphetamine.[3]

11.     Although D'Alessandro's original intention was to conduct a home inspection, after identifying the chemical odor, he determined that he and Peoples needed to conduct a search.  Once inside the residence, D'Alessandro reminded Defendant that his conditions of supervised release included a search condition and that it was their intention to search Defendant's residence.  Defendant responded, "Sure, look around.  I have nothing to hide."

12.     D'Alessandro and Defendant went into the kitchen to talk.  D'Alessandro requested that Defendant submit to a drug test, but Defendant responded that he  was unable to immediately give a urine sample.   It was D'Alessandro's experience that individuals usually responded in this fashion when they had recently used drugs and were concerned about the results of the drug test.

13.     While D'Alessandro and Defendant were discussing the drug test, Peoples went to Defendant's bedroom to conduct a search.[4]  Inside a night stand, Peoples found

---

methamphetamine.  Peoples simply could not remember the extent of his question. Because their testimony is generally consistent, the Court finds that Peoples did identify a metallic smell to D'Alessandro that he associated with the manufacturing of methamphetamine.

[3]  D'Alessandro admitted that he is not trained in methamphetamine investigation and was not able to independently identify the metallic smell as one that is commonly associated with fuel used to manufacture methamphetamine.  He was able to identify the smell and understand its significance only after it was identified by Peoples.    Unlike D'Alessandro, Peoples had extensive training and experience in methamphetamine investigations.    In August 2002, he attended a 40-hour class on clandestine methamphetamine lab operations sponsored by the Drug Enforcement Agency in Quantico, Virginia.  During that class, Peoples learned about the processes and materials utilized in manufacturing methamphetamine. Since 2002, Peoples continued to gain experience in methamphetamine investigations, leading or assisting the investigation of 20 to 25 methamphetamine-related cases in Pendleton County, Kentucky.

[4]  Peoples testified that he was acting under D'Alessandro's probationary authority when he accompanied D'Alessandro to Defendant's residence and conducted the search.

a blue and black bag containing Liquid Fire, red devil lye, plastic hoses, coffee filters, and other household items. Peoples brought the bag into the living room, where D'Alessandro and Defendant were located, and asked Defendant about the items. Defendant denied any knowledge of the contents of the bag. Peoples then explained that they were items commonly used to manufacture methamphetamine, but Defendant did not respond.

14.     Peoples then went outside to continue his search. He found additional items used to manufacture methamphetamine in the shed, on the deck, and underneath the skirting of the residence. After finding multiple items outside, Peoples returned inside and asked whether there was anything at the residence that could potentially harm the officers. Defendant responded that there was an "old cook" in a hutch against the wall in the kitchen. Peoples opened the bottom doors on the hutch and located a two-liter bottle. Batteries with stripped lithium and other precursors to methamphetamine were found on the top of the hutch. Peoples found a firearm inside the microwave. Defendant was then placed in custody.

15.     Other items found during the search included: (1) Coleman fuel, which Peoples identified as the source of the chemical or metallic smell; (2) a black box containing multiple bags of methamphetamine; and (3) a cigarette box containing unspecified items.

### III.  Analysis

#### A.    The Court's Fourth Amendment Analysis is Governed by *United States v. Knights*, 534 U.S. 112 (2001)

"A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987).

7

The Fourth Amendment guarantees people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend IV. The Supreme Court has interpreted the text of this Amendment as having two requirements. *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011). "First, all searches and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Id.*

The Supreme Court has generally held that a search is reasonable only if it is undertaken pursuant to a warrant. *Id.* "It is a basic principle of Fourth Amendment law ... that searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). However, the Court has also recognized that the presumption may be overcome in some circumstances because "[t]he ultimate touchstone of the Fourth Amendment is reasonableness." *Id.* As a result, the warrant requirement is subject to certain limited exceptions.

In 1987, the Supreme Court announced an exception to the warrant requirement for searches of probationer's homes. In *Griffin v. Wisconsin*, 483 U.S. 868 (1987), a probation officer searched a probationer's apartment without a warrant after learning from a detective that there might be guns inside. *Id.* at 871. The probation officer ultimately recovered a handgun. *Id.* The officer conducted the search under the authority of a Wisconsin state law that "put probationers in the legal custody of the State Department of Health and Social

8

Services and render[ed] them subject . . . to . . . conditions set by the court and rules and regulations established by the department." *Id.* at 870 (internal citations omitted). One of the regulations allowed "probation officer[s] to search a probationer's home without a warrant as long as his supervisor approves and as long as there are 'reasonable grounds' to believe the presence of contraband." *Id.* at 871 (internal citations omitted).

The trial court denied the defendant's motion to dismiss, finding that no warrant was necessary and the search was reasonable. *Id.* at 872. The defendant was ultimately convicted. *Id.* On appeal, the Wisconsin Supreme Court affirmed the trial court's order denying the motion to dismiss. *Id.* It found that probation diminishes a probationer's reasonable expectation of privacy "so that a probation officer may, consistent with the Fourth Amendment, search a probationer's home without a warrant, and with only 'reasonable grounds' to believe that contraband is present." *Id.*

On *certiorari*, the Supreme Court refused to determine whether it should adopt the broad legal policy reached by the Wisconsin Supreme Court – "whether any search of a probationer's home by a probation officer satisfies the Fourth Amendment so long as the information possessed by the official satisfies a federal 'reasonable grounds' standard." *Id.* Instead, the Court affirmed the search under the "special needs" exception to the warrant requirement, which recognizes that "'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Id.* at 873 (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 361 (1985) (Blackmun, J., concurring in judgment)). The Court concluded that probation officers have a special need to ensure that probationers are compliant with their terms of probation. *Id.* at 873-74. Therefore, a warrantless search of a probationer's residence "satisfie[s] the demands of the Fourth

9

Amendment [if] it [is] carried out pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement under well-established principles." *Id.* at 873.

Nearly fourteen years later, in *United States v. Knights*, 534 U.S. 112 (2001), the Supreme Court "considered the broader question it expressly declined to address in *Griffin*: that is, whether a warrantless search of a probationer could be reasonable under the Fourth Amendment." *United States v. Herndon*, 501 F.3d 683, 688 (6th Cir. 2007). In *Knights*, a police officer searched the probationer's home without a warrant because he was aware that the defendant's probation order included a search condition. *Knights*, 534 U.S. at 115. The District Court suppressed evidence found inside the probationer's home, finding that it was not a proper "probationary" search under *Griffin*. *Id.* at 116. The Court of Appeals for the Ninth Circuit affirmed. *Id.*

At the outset, the Supreme Court explained that *Griffin* did not govern all warrantless searches of a probationer's home. *Id.* at 117. Instead of analyzing the search under the "special needs" exception to the warrant requirement, the Supreme Court concluded that the search of the probationer's home was "reasonable under our *general* Fourth Amendment approach of 'examining the totality of the circumstances,' with the probation search condition being a salient circumstance." *Id.* at 118 (emphasis added) (quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

In examining the totality of the circumstances, the Court balanced "the degree to which [a search] intrudes upon an individual's privacy" against "the degree to which it is needed for the promotion of legitimate government interests." *Id.* at 119. The Court stated that the defendant's "status as a probationer subject to a search condition inform[ed] both sides of that balance." In assessing a probationer's privacy interest, the Court found that

10

a probationer has a reduced expectation of privacy.  After all, "inherent to the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled."  *Id.* (internal quotation omitted).  Moreover, when a probationer is aware that he is subject to a warrantless search as a term of his probation, the Court held that this significantly diminishes the probationer's reasonable expectation of privacy.  *Id.*

On the other hand, the Court found that the government has a strong interest in searching a probationer's home.  *Id.* at 120.  Quoting *Griffin*, the Court stated "'the very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law.'"  *Id.* (quoting *Griffin*, 438 U.S. at 880).  Even more, probationers have a greater "incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal because probationers are aware that they may be subject to supervision and face revocation of probation, in proceedings in which the trial rights of a jury and proof beyond a reasonable doubt, among other things, do not apply."  *Id.*  Ultimately, the state has a strong interest in searching a probationer's home without a warrant and on less than probable cause.  *Id.* at 121.

After weighing the competing interests, the Court concluded that "the balance of these considerations requires no more than a reasonable suspicion to conduct a search of [a] probationer's house."  *Id.* at 121.  These same interests also led the Court to conclude that a warrant requirement was unnecessary. *Id.*  Thus, "the warrantless search of [a probationer's residence], supported by reasonable suspicion and authorized by a condition of probation, [is] reasonable within the meaning of the Fourth Amendment."  *Id.* at 122.

*Griffin* and *Knights* are similar in that they both require an officer to have reasonable suspicion before searching a probationer's home. However, the Sixth Circuit has stated that "*Griffin* and *Knights* represent two distinct analytical approaches under which a warrantless probationer search may be excused." *United States v. Herndon*, 501 F.3d 683, 688 (2007). Following the *Griffin* approach, the Sixth Circuit instructs courts to conduct a two-pronged inquiry focusing on (1) an examination of the relevant provision authorizing a search and (2) a determination of whether the search complied with the applicable provision. *Id.* at 688-89. A search provision is generally valid so long as it contains a reasonable suspicion requirement. *Id.* at 689. If, however, the search provision is invalid because it does not include a reasonable suspicion standard, the warrantless search may still be valid under *Knights*. *Id.*

Here, Defendant argues that the search conducted by D'Alessandro and Peoples is invalid under *Griffin* for two reasons. First, the search condition in Defendant's Special Conditions of Supervised Release did not include a reasonable suspicion requirement. Instead, it states, "The defendant shall submit his person, residence and curtilage, office or vehicle to a search, upon direction and discretion of the United States Probation Office." (Ex. # 1, at 4). Because this condition does not include a reasonable suspicion standard, it is doubtful that it would meet the first prong of the *Griffin* test. However, this shortcoming ultimately has no effect because the search may still be analyzed, and upheld, under *Knights*. *See Herndon*, 501 F.3d at 689.

Second, Defendant argues that the search failed to comply with the United States Probation Office's search procedure, failing the second prong of the *Griffin* inquiry. The Probation Office's policy states that a probation officer may conduct a search only upon

12

consent or pursuant to a special condition of release. (Doc. # 28-1). Moreover, probation officers are to receive written approval *before* conducting a search, unless exigent circumstances make it impractical to receive prior approval. (*Id.*). In those cases, "the application or approval may be presented orally and reduced to writing at the earliest opportunity." (*Id.*). Defendant argues that D'Alessandro received neither prior written approval nor any approval later in time.

Defendant's argument about D'Alessandro's compliance with Probation's search policy is misguided. The first prong of the *Griffin* inquiry "calls for an examination of the validity of the relevant provision *authorizing* a search." *Herndon*, 501 F.3d at 688 (emphasis added). Here, the authorizing provision is the Special Condition of Release contained in the Judgment. (Ex. # 1, at 4). In fact, the first rule under "General Rules for Searches" in Probation's policy states that "a search of the person, residence, office or vehicle of a supervisee may be conducted by a probation officer only . . . pursuant to a special condition of release." (Doc. # 28-1). As the policy itself recognizes, the provision authorizing a search is the Special Condition of Release contained in the Judgment. Thus, the policy is not relevant to the *Griffin* analysis, and the Court need not consider whether D'Alessandro complied with the policy under the second prong of the *Griffin* test.

Having determined that the search cannot be upheld under *Griffin*, the Court will analyze the search under *Knights*. *See Herndon*, 501 F.3d at 689 (holding that a search may be analyzed in accordance with *Knights* when it would otherwise fail under *Griffin*). Before applying *Knights*, two additional matters must be considered. First, Defendant had a reduced expectation of privacy similar to the probationer in *Knights*. Like the probationer in *Knights*, Defendant's conditions of supervised release contained a search condition and

13

Defendant was unambiguously informed of that condition.  Also similar to the probationer in *Knights*, Defendant did not enjoy the "absolute liberty to which every citizen is entitled" while on supervised release.  *See Knights*, 534 U.S. at 119.  Instead, he was precluded from leaving the judicial district without the permission of the court or probation officer, required to allow a probation officer to visit him at any time at home or elsewhere, and was required to abstain from alcohol, among other conditions.

The government, on the other hand, both here and in *Knights*, has a substantial interest in protecting society and insuring the progress of supervised releasees by searching their homes.  Ultimately, the competing interests of the Defendant and the government in this case are nearly identical to those addressed in *Knights*.  Therefore, as the Court held in *Knights*, "the balance of these considerations requires no more than reasonable suspicion to conduct a search of this [supervised releasee's] home."  *Knights*, 534 U.S. at 121.

*Knights* is also applicable despite Defendant's status as a supervised releasee.  *Knights* specifically addressed the warrantless search of a probationer's home.  However, other court's have applied *Knights'* reasonable suspicion analysis to the search of a supervised releasee's residence.  *See, e.g., United States v. Krug*, No. 3:09cr257, 2010 WL 2196607, at *4-5 (M.D. Tenn. May 26, 2010).  Moreover, other circuits have recognized that supervised releasees and probationers have similar expectations of privacy.  *See United States v. Stewart*, 532 F.3d 32, 36 (1st Cir. 2008) (recognizing that probation and supervised release are different forms of conditional release, and courts have not distinguished among conditional releasees for Fourth Amendment purposes); *United States v. Weikert*, 504 F.3d 1, 12 (1st Cir. 2007) (refusing to distinguish the privacy interests of a

14

supervised releasee from a probationer); *United States v. Zimmerman*, 514 F.3d 851, 855 (9th Cir. 2007) (treating probationer's Fourth Amendment challenge to DNA Act as foreclosed by prior precedent addressing challenge by supervised releasee); *Banks v. United States*, 490 F.3d 1178, 1187 (10th Cir. 2007) (supervised releasees and probationers fall into the "category of felons on release who are not entitled to the full panoply of rights and protections possessed by the general republic").  In fact, the Second Circuit has held that supervised release places the most severe limits on expectations of privacy, greater than those of both parole and probation.  *United States v. Balon*, 384 F.3d 38, 44 (2d Cir. 2004).  Therefore, Defendant, as a supervised releasee, had the same, if not less, expectation of privacy as did the probationer in *Knights*.  As a result, *Knights'* holding that the Fourth Amendment requires "no more than reasonable suspicion to conduct a search" of a probationer applies to the search of Defendant's residence.  *See Knights*, 534 U.S. at 121.

### B.   USPO D'Alessandro had reasonable suspicion that Defendant was engaged in criminal activity

Reasonable suspicion is a far less demanding standard than probable cause, which requires considerably less than proof of wrongdoing by the preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  Reasonable suspicion requires "at least a minimal level of objective justification" that criminal activity may be afoot.  *Illinois v. Wardlow*, 528 U.S. 119, 123.  "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity."  *Id.* at 123-24 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

15

"Reasonable suspicion . . . is determined from the totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Therefore, the Court may not evaluate facts giving rise to reasonable suspicion in isolation, but instead must consider all of the facts in totality. *Id.* at 274. The Court must also allow "officers to draw on their own experiences and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* at 273 (citation omitted).

According to the United States, the following facts support the conclusion that D'Alessandro had reasonable suspicion that Defendant was manufacturing or using methamphetamine, or trafficking its precursors.[5] First, D'Alessandro knew that Defendant had been convicted of conspiring to manufacture methamphetamine and was still on supervised release for that conviction. Second, D'Alessandro had received an anonymous letter indicating that Defendant should be drug tested. Third, D'Alessandro knew about the NPLEx e-mail notification, which stated that Defendant's wife, residing at Defendant's address, had purchased a precursor to methamphetamine shortly before D'Alessandro

---

[5]    The United States also argues that two additional facts provided reasonable suspicion that Defendant was engaged in criminal activity. First, the United States suggests that "When P.O. D'Alessandro knocked on Lykins's door, it took Lykins's (sic) some time to open the door, indicating to the officers that Lykins was secreting items. A gun was found in Lykins's microwave." Second, the government states that "Lykins refused to produce a urine sample for drug testing. Based on his experience, P.O. D'Alessandro felt Lykins was stalling, which probationers will often do if they are going to test positive. Lykins finally admitted he would test positive."

However, neither of these facts will be considered in the Court's reasonable suspicion equation. The testimony at the evidentiary hearing does not support the finding that Defendant took some time to open the door. Instead, D'Alessandro testified that "[w]hen we arrived, I went to the front door and knocked on the front door . . . Jimmy was there. He let us in the residence, and we entered the front door." (Doc. # 31, at 17). D'Alessandro never indicated that Defendant was delayed in answering the door.

Defendant's initial inability to provide a urine sample is also not relevant to the reasonable suspicion inquiry. After entering Defendant's residence and having a brief conversation with Defendant, Peoples searched the bedroom while D'Alessandro attempted to perform the drug test. Thus, the search was already in progress when Defendant stated that he could not provide a urine sample. This information is simply not relevant to the facts that D'Alessandro knew before the search was conducted.

arrived at Defendant's residence.  After learning about the NPLEx e-mail notification, Sheriff

Peoples explained to D'Alessandro that when he receives NPLEx hits on individuals that

he has been targeting, his training and experience led him to believe that the individual

identified in the notification and other associates will soon be preparing to manufacture

methamphetamine.  Sheriff Peoples also explained to D'Alessandro that Defendant was

a subject in his two-year investigation into methamphetamine-related crimes in Pendleton

County.  Finally, D'Alessandro detected a metallic odor when he arrived at Defendant's

residence, which Peoples explained to him was commonly associated with a precursor to

manufacture methamphetamine.  Considering this information in its totality, D'Alessandro

had reasonable suspicion that Defendant was engaged in criminal activity related to

methamphetamine.

Most importantly, as D'Alessandro entered the residence, Peoples pointed out a

chemical odor and explained to D'Alessandro that it was an odor associated with a

precursor to methamphetamine.[6]  D'Alessandro was then able to detect a "metallic" odor.

The Sixth Circuit has routinely held that detecting an odor of an illegal substance provides

at least reasonable suspicion.  *See United States v. Noble*, 364 F. App'x 961, 964 (6th Cir.

2010) (smell of marijuana gave officer reasonable suspicion to justify further detention

under *Terry*); *United States v. Ivey*, 307 F. App'x 941, 942 (6th Cir. 2009) (smell of alcohol

provided requisite suspicion to justify continued detention under *Terry*); *United States v.

Foster*, 376 F.3d 577, 588 (6th Cir. 2004) (holding that "when the officers detected the

_____

[6] On cross-examination at the evidentiary hearing, D'Alessandro stated "I was a little suspicious of what
was going on with Jim when I received the letter.  When I got to the sheriff's office, I became more suspicious
that there may be something going on.  When I crossed the threshold and the sheriff said hey, *I smell
something that I know could be methamphetamine trafficking*, that's – that is at the point where I shifted from
a walk-through inspection to a search."  (Doc. # 31, at 31).

smell of marijuana coming from Foster's vehicle, this provided them with probable cause to search the vehicle without a search warrant" which "therefore turned a lawful *Terry* stop into a lawful search"). In fact, "the detection of a narcotic's odor, by itself, is sufficient to provide probable cause to conduct a lawful search of a vehicle." *United States v. Crumb*, 287 F. App'x 511, 514 (6th Cir. 2008).

Although D'Alessandro detected an odor associated with a precursor to manufacturing, it still gave him reasonable suspicion that criminal activity was afoot. In *United States v. Borne*, the Sixth Circuit found that an officer had reasonable suspicion when the officer noticed a "strong chemical odor" that he associated with methamphetamine based on his prior experiences. *United States v. Borne*, 239 F. App'x 185, 186-87 (6th Cir. 2007). The Circuit found that the officer's subsequent *Terry* frisk was reasonable based on the odor and the officer's knowledge that the defendant had prior methamphetamine-related offenses. *Id.*

The Sixth Circuit's holding in *Borne* is supported by other circuits. For example, in *Kleinholz v. United States*, the Eighth Circuit found that officers had probable cause to search a home when "law enforcement smelled ether: a substance known to be used in the manufacture of methamphetamine." 339 F.3d 674, 677 (8th Cir. 2003). In fact, the *Kleinholz* Court stated that "the smell of ether might *alone* support a finding of probable cause." *Id.* (emphasis added). Certainly, the court stated, "such an odor coupled with other facts support a finding of probable cause." *Id.* The Ninth Circuit reached a similar conclusion in *United States v. Lillard*, 929 F.2d 500, 502 (9th Cir. 1991). In that case, officers approached a vehicle and "smelled a distinct odor they knew was associated with making methamphetamine." *Id.* The court held that "this fact, coupled with earlier

18

suspicions that Lillard was making the drug, supports the conclusion that there was probable cause to arrest." *Id.  See also United States v. Marasco*, 446 F. Supp. 2d 1073, 1080 (D. Neb. 2006), *rev'd in part on other ground*, 487 F.3d 543 (2007) (holding that officer had reasonable suspicion to search when he detected a strong odor of anhydrous ammonia that he knew was used to make methamphetamine based on his prior experience).   In accordance with *Borne*, *Kleinholz*, and *Lillard*, D'Alessandro had reasonable suspicion to believe that Defendant was engaged in illegal activity after he detected the chemical smell and Peoples stated that the smell was commonly associated with manufacturing methamphetamine.

The chemical odor is not, however, the only information that provided D'Alessandro with reasonable suspicion to search. *See Kleinholz*, 339 F.3d at 677 ("[C]ertainly such an odor coupled with other facts support a finding of probable cause").  D'Alessandro was Defendant's supervising probation officer for his 2004 conviction of conspiracy to manufacture and distribute methamphetamine. Like the Sixth Circuit held in *Borne*, it was appropriate for D'Alessandro to consider Defendant's criminal history along with the smell in finding reasonable suspicion to search.  *See  Borne*, 239 F. App'x at 186-87; *See also United States v. Heath*, 259 F.3d 522, 528-29 (6th Cir. 2001) (finding that the officer's knowledge of the suspect's prior drug trafficking conviction, among other facts, supported reasonable suspicion).

D'Alessandro was also aware of another crucial piece of information -- approximately an hour before they conducted the search, Defendant's wife had purchased pseudoephedrine at a pharmacy in Boone County, Kentucky.  Defendant argues that this fact is irrelevant for two reasons.   First, Defendant asserts that purchasing

pseudoephedrine is not illegal and cannot create reasonable suspicion. Second, Defendant contends that he did not purchase the pseudoephedrine and, thus, the purchase cannot implicate him. However, Defendant's attempt to trivialize this fact is unconvincing.

In *Illinois v. Gates*, the Supreme Court stated that "innocent behavior frequently will provide the basis for a showing of probable cause." 462 U.S. 213, 243 n.13 (1983). "In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *Id.* Accordingly, although it is not illegal to purchase pseudoephedrine, it is certainly suspicious that the wife of someone with a prior methamphetamine-related conviction was purchasing a precursor to methamphetamine. *See, e.g., United States v. Ameling*, 328 F.3d 443, 448 (8th Cir. 2003) (recognizing that purchasing pseudoephedrine, coupled with other facts, can support reasonable suspicion). This is not to say that the NPLEx notification alone gave D'Alessandro reasonable suspicion, but only that it is relevant to the totality of the circumstances analysis.

The United States also argues that the anonymous letter sent to the United States Probation Office is relevant to the reasonable suspicion inquiry. Defendant argues that the Court should not consider this letter because it is anonymous. The Supreme Court has held that an "anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity" and cannot provide reasonable suspicion unless they can be adequately corroborated. *Florida v. L.J.*, 529 U.S. 266, 270 (2000). Here, the anonymous letter stated generally that "[Defendant] is out of control and needs drug tested." (Ex. # 4). This general assertion that Defendant needs to be drug tested is the type of "vague information that is not predictive of future illegal activity," and it could not independently give D'Alessandro

20

reasonable suspicion that Defendant was engaged in illegal activity. *See Srisavath v. City of Brentwood*, 243 F. App'x 909, 915 (6th Cir. 2007).

However, as D'Alessandro testified during the evidentiary hearing, the anonymous letter only caused him to begin his investigation. (Doc. # 31). That is the only relevance of the letter. D'Alessandro did not search Defendant's residence based on the anonymous letter. Instead, D'Alessandro lawfully gathered additional information which gave him reasonable suspicion that Defendant was engaging in unlawful activity. Thus, the Court need not determine whether the anonymous letter added to the totality of the circumstances that provided D'Alessandro with reasonable suspicion that Defendant was involved in criminal activity.

Ultimately, the totality of the circumstances indicate that D'Alessandro had reasonable suspicion to believe that Defendant was manufacturing or using methamphetamine, or trafficking its precursors. Therefore, the warrantless search of Defendant's residence, supported by reasonable suspicion and authorized by a condition of his supervised release, was reasonable within the meaning of the Fourth Amendment.

### C. Sheriff Peoples acted under the authority of United States Probation Officer D'Alessandro at all times and there is no evidence to support the "Stalking Horse" Theory

Defendant argues that D'Alessandro served as a "stalking horse" for Peoples to conduct an otherwise unlawful search. In *United States v. Watts*, the Ninth Circuit succinctly articulated the contours of the "stalking horse" theory:

> A probation officer acts as a stalking horse if he conducts a probation search on prior request of and in concert with law enforcement officers. However, collaboration between a probation officer and police does not in itself render a probation search unlawful. The appropriate inquiry is whether the probation officer used the probation search to help police evade the Fourth

> Amendment's usual warrant and probable cause requirements or whether the probation officer enlisted the police to assist his own legitimate objectives. A probation officer does not act as a stalking horse if he initiates the search in the performance of his duties as a probation officer.

67 F.3d 790, 794 (9th Cir. 1995), *rev'd on other grounds*, 519 U.S. 148 (1997) (internal citations omitted); *See also United States v. McFarland*, 116 F.3d 316, 318 (8th Cir. 1997) (stating that "a parole search is unlawful when it is nothing more than a ruse for a police investigation," but noting that "[p]arole and police officers may work together . . . provided the parole officer is pursuing parole-related objectives").

Several circuits have rejected the stalking horse theory in light of the Supreme Court's holding in *Knights*,[7] however the Sixth Circuit has yet to do so. Instead, in *United States v. Penson*, 141 F. App'x 406, 410 n.2 (6th Cir. 2005), the Sixth Circuit recognized that the viability of the stalking horse theory is in question post-*Knights*, but held that the theory did not apply to the circumstances of the case. Therefore, the court found no need to decide the issue. *Id.*

Assuming, *arguendo*, that the stalking horse theory is still viable, it is inapplicable to the facts of this case. D'Alessandro had planned to conduct a home visit and inspect Defendant's residence before he ever met with the sheriff. Additionally, D'Alessandro initiated contact with Peoples when he stopped at the Sheriff's office to discuss an unrelated matter. Furthermore, D'Alessandro asked Peoples to accompany him to

---

[7] *United States v. Brown*, 346 F.3d 808, 811-12 (8th Cir. 2003) (stating "the Court confirmed that the Fourth Amendment does not require a stalking horse theory); *United States v. Stokes*, 292 F.3d 964, 967-68 (9th Cir. 2002) ("Accordingly, our circuit's line of cases holding searches of probationers invalid on the ground that they were subterfuges for criminal investigations in, in that respect, no longer good law); *See also United States v. Williams*, 417 F.3d 373, 377 (3d Cir. 2005) ("It is clear that the Supreme Court's more recent teaching in *Knights* precludes the viability of 'stalking horse' claims in this context"); *United States v. Reyes*, 283 F.3d 446, 463-65 (2d Cir. 2002) (refusing to adopt the stalking horse theory on different principles ); *Riley v. Kentucky*, 120 S.W.3d 622, 628 (Ky. 2003) ("*Knights* eliminated the 'stalking horse' defense").

Defendant's house in conformance with a common practice of probation officers when visiting residences in remote areas.  Most importantly, as Peoples later explained, he "was there to assist at the direction of Mr. D'Alessandro."  (Doc. # 31, at 63).  The facts simply do not show that Peoples initiated contact with D'Alessandro or otherwise used D'Alessandro's probationary authority as a subterfuge to conduct a warrantless search.  Therefore, if the stalking horse theory remains viable, it does not apply to the facts presented here.

## IV.    Conclusion

Accordingly, for all of these reasons, **IT IS ORDERED** that Defendant's Motion to Suppress (Doc. # 17) evidence seized from his residence and curtilage on October 12, 2011 is hereby **DENIED**.  The time period between February 17, 2012 and the date of this Order, totaling 103 days, is excluded from the provisions of the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(1)(D).

**IT IS FURTHER ORDERED** that this matter is scheduled for a **Status Conference on June 8, 2012 at 11:30 a.m. in Covington**.

This 30th day of May, 2012.



Signed By:

*David L. Bunning*    DB

**United States District Judge**

G:\DATA\ORDERS\Covington Criminal\2012\12-2 MOO denying mtn to suppress.wpd